The next case on for argument is Matthews v. Sessions. Thank you, Your Honor. David Zimmer on behalf of Petitioner, Mr. Gerard Matthews. The Immigration and Nationality Act makes non-citizens removable if convicted of one of three specific crimes against children. Child abuse, child neglect, and child abandonment. Mr. Matthews was not convicted of one of those crimes. Instead, he was convicted of misdemeanor child endangerment, a distinct and less serious offense that, in New York, only rarely results in any imprisonment. Indeed, this Court has already recognized that New York's misdemeanor endangerment provision is extraordinarily broad. It criminalizes leaving children even briefly unattended and committing any criminal act, no matter how minor, in the presence of a child. In determining that this misdemeanor endangerment provision is nevertheless a categorical crime of abuse, neglect, or abandonment, the BIA misinterpreted both New York law and the Immigration and Nationality Act. The BIA first went wrong in Sorem, where it held that child endangerment is generally a removable offense. That is not a permissible interpretation of the statute under Chevron's first step, as it expands the generic federal offense far beyond the abuse, neglect, and abandonment that Congress identified in the statute. Indeed, every relevant tool of statutory interpretation points the same way, that the 1996 Congress that enacted this provision would not have understood the terms abuse, neglect, and abandonment to encompass the type of broad general endangerment defense at issue in this case. For instance, in 1996, the dictionaries that were in circulation defunct... You argue that Esquivel-Quintana effectively undermined the rationale of Florence, right? That's correct. Do you read Esquivel-Quintana as a decision following a Chevron analysis? Yes, Your Honor, absolutely. I mean, yes, it absolutely did. It specifically concluded that the statute was unambiguous, read using the tools involved. How do you square that with the final part of Esquivel-Quintana, which expressly says we have no need to resolve whether the rule of lenity or Chevron receives priority in this case because the statute read in context unambiguously forecloses the board's interpretation. Therefore, neither the rule of lenity nor Chevron applies. Right. How can we read Esquivel-Quintana as a decision applying Chevron when the Supreme Court says it wasn't? I think what that means, and I think this is clear from the context of the decision, is that Chevron's second step, so the reasonableness analysis, does not apply, because one of the issues in that case was this tension between a rule of lenity, which is an interpretive tool that obviously says read all ambiguities in favor of the defendant, and Chevron, which says read all ambiguities in favor of the agency. And what the Court said in this case is that when you read the statute's text, applying other normal rules of statutory interpretation, that the statute unambiguously precludes the agency's interpretation. If we are to read Esquivel-Quintana as a decision applying a new standard of how do we apply the first prong of Chevron, wouldn't the Supreme Court in Esquivel-Quintana at least have discussed some of the Chevron prong one cases to tell us how that's supposedly fitting in to the jurisprudence of prong one of Chevron? Well, Your Honor, the entire case in Esquivel-Quintana was litigated as a Chevron step one case, so I think that it was actually well established that normal tools of statutory interpretation do apply at Chevron's first step, and that's why the Court comes back in the paragraph that you quoted in talking about how the statute unambiguously forecloses the board's interpretation, and that is Chevron step one. The question at Chevron's first step is whether the statute's text, read using standard interpretive tools, unambiguously forecloses the agency interpretation at issue, and that's, of course, exactly what the Supreme Court did in Esquivel-Quintana, is it looked at the statutory text and then applied a series of interpretive tools and concluded that read using those tools, the statute unambiguously precludes what the agency did in that case, and that's all we're asking this Court to do here, and it's what the panel in Flores did not do, which is to actually look past the fact that there's no dictionary definition, sorry, that there's no statutory definition of the generic federal offense, and to apply normal interpretive tools to understand the language that Congress used and to understand whether Congress could have understood the terms abuse, neglect, and abandonment to encompass this type of broad endangerment defense. And applying those tools, applying the same tools that the Supreme Court applied in Esquivel-Quintana, it's clear that Congress could not, that Congress did not intend to make noncitizens removable based on convictions for this type of general endangerment, these broad general endangerment provisions at issue in this case. Because that wasn't the state of the law using the mechanisms by which we look at that at the time the statute was passed? It's not what the words meant. It's not what the words abuse, neglect, and abandonment meant in 1996, and it's not what Congress would have or could have intended those words to use because the ordinary meaning of those terms as understood in dictionaries in circulation at that time did not encompass endangerment because the vast majority of states in 1996 did not understand, did not define their criminal abuse, neglect, and abandonment provisions to encompass endangerment. The vast majority of states either did not criminalize endangerment at all or else defined it as a separate lesser offense that is entirely distinct from abuse, neglect, or abandonment. But why aren't we still bound by Flores' finding that the statutory language was ambiguous? Well, again, the reason is that Esquivel-Quintana, the reasoning that Flores used to get to that point, to find the language unambiguous, directly conflicts with Esquivel-Quintana in the sense that, and again, our argument, to be clear, is not that the statute contains no ambiguity, but that's not the correct inquiry. The inquiry, as the government agrees, is whether the statute unambiguously precludes the specific interpretation adopted by the agency in this case. And so the Supreme Court in Esquivel-Quintana held that the fact that there's no statutory definition and the fact that the state laws vary is not enough to show that the agency, that there's ambiguity. But that's all that this court relied on in Flores. And this court's decision, like Doshier and Inri Zarnel, make clear that when a subsequent Supreme Court decision reduces one of this court's past decisions to a question and answer and no intervening reasoning, that the court is required to reconsider the analysis. And that's all we're asking that the court do here, to go back and apply the analysis the Supreme Court applied to a structurally identical question in Esquivel-Quintana. Let me ask another question. You suggest, as do Amiki, that we should look to certain charging documents and police documents to establish the scope and practice of prosecutions for the child endangerment statute. And I'm concerned about how we can rely on them or look to them, since they were not part of the administrative record. And most of the data that is cited shows that approximately one-third of endangerment charges are dismissed. What can we really learn from those, and are we entitled to look at them here? Right. So I think the court is entitled to look at them. And especially in the context that these documents and other similar documents, we don't know exactly what was before the BIA, but it's clear from the BIA's decision in Mendoza-Osorio that there were charging documents before it that it categorically refused to consider. And so at the very least, that decision was incorrect, or we would argue that that decision was incorrect. These are not public documents that we're entitled to take judicial notice of, are they? Well, they are publicly filed. I believe the court probably could take judicial notice of them. Obviously not of them for what they are, which is that there is a charge based on these documents. I gather that their authenticity isn't disputed, but I'm not sure that they're treated as public documents on the record of the ordinary type that we can notice. Yeah. So, I mean, our argument is not that the court should decide this case specifically based on the ten charging documents that are attached to the amicus brief. Our argument is just that the BIA, in categorically refusing to consider this type of evidence, inevitably misunderstood the state statute's scope, and that that's really the legal error that we're pointing to. And we also would point this case to specific – I realize I'm going over my time here – but that there are specific decisions from the courts, you know, judicial decisions like Reyes, like Gulab, like Alvarez, that really support the type of conduct or very similar to the type of conduct in these documents. But they also show that courts have been willing in New York to make factual findings, really, that certain conduct was likely to be injurious to a child. And aren't we obligated to defer to those kind of findings? Absolutely. And, I mean, that's what – that's exactly what we're – I mean, in cases like Reyes, and perhaps I'm misunderstanding your question, but in those cases, the courts are finding that these types of charges, a mother leaving a child for 15 minutes while getting groceries for dinner, that that conduct is sufficient to support a charge for child endangerment. That smoking marijuana in an apartment where a child who is not the defendant's child was in another room, that smoking marijuana in that apartment, that is child endangerment. That is far beyond the type of conduct that would normally be considered – or that Congress could have considered abuse and neglect. That illustrates the application of the New York statute. Correct. And those are published decisions. Thank you. Thank you, Mr. Zimmer. You've reserved two minutes. And Ms. Park. May it please the Court, Song Park for the Attorney General. Mr. Matthews seeks to challenge the agency's determination that his two convictions for child endangerment under the New York state law does not constitute a removability ground as outlined under the INA, provided as defined to be a child's – a crime of child abuse, neglect, or abandonment. But as this Court has already found in Flores, the agency's generic definition of what constitutes a crime of child abuse as used in that removability provision is a reasonable interpretation that is entitled to Chevron deference. And nothing that the Supreme Court has issued, particularly with respect to the case in Escobar-Quintana, changes that analysis or that conclusion of this Court. The agency has defined a crime of child abuse as any – May I just ask, since Escobar-Quintana, what is your count with respect to what other courts' appeals have done with respect to whether Escobar-Quintana changes the first step of the Chevron analysis? Two courts have already considered this particular issue opposed to Escobar-Quintana, the Seventh Circuit in Correa, as well as the Third Circuit in Mondragon. And in both cases, in published decisions, both the Seventh and the Third Circuit decided that Escobar-Quintana had no application to the analysis at hand, and in fact that Escobar-Quintana was a very, very narrow holding with respect to the specific question of what is the age of consent when it comes to statutory rape crimes. And aside from that, that there is no other impact from Escobar-Quintana that would change the scope or the analysis of how to determine a generic federal – a generic term as Petitioner here would request the Court to do. What do you think Escobar-Quintana was doing? Escobar-Quintana was considering – it arose in the very specific and narrow context of statutory rape crimes. And in trying to consider does a statutory rape crime, which only prescribes conduct purely based on nothing more than age of the participants, the Court was wondering – was trying to determine does statutory rape equal a sexual abuse of a minor, which is an aggravated felony provision in a different section of the INA. What was it doing? The age of statutory rape is – it was not in the Immigration and Naturalization Act. That's correct. It was attempting to determine whether that age is somehow within the sexual abuse of a minor, and it made a determination that the statute was unambiguous that it was not. What was it doing? I think it's important to note the narrow scope of Escobar-Quintana. Yes, it was considering these issues and applying its analysis within the context of a – the sexual abuse of a minor charge. However, it's with – it was looking very narrowly at the – in terms of analyzing and looking at the specific crime of – the subsection of crime of statutory rape. And the Court there was very careful and very explicit in indicating that it was not determining the Federal generic term of what constitutes a sexual abuse of a minor. It made itself very clear in its decision that it was – the issue at hand and the determination it was making was with respect to what is the age of consent when it comes to the subset of sexual abuse of a minor case that involves statutory rape. And, in fact, to the extent Petitioner is asking this Court to find error in the Board's series of decisions that arrived at the Federal generic definition of what constitutes a crime of child abuse because it did not do this broad, expansive – necessarily conduct this broad, expansive survey as the law was in 1996. In fact, in Escobar-Quintana itself, the Supreme Court agreed with the government's position that that type of expansive survey is not a requisite or a requirement for purposes of determining the – or applying the categorical analysis. So the – putting – even putting aside that the Board did conduct this broad, multi-jurisdictional analysis in reaching its generic definition for what constitutes a crime of child abuse, that's – that methodology is certainly not something that the Supreme Court has required administrative agencies to apply. And certainly this Court has already recognized that very point in Flores. If we agree with you that Escobar-Quintana doesn't abrogate or seriously undercut our ruling in Flores, it seems to me we're still obligated to consider whether New York law's categorically a crime of child abuse, the 26 – 260.10, if Mr. Matthews can demonstrate a realistic possibility that the State would apply its statute of conduct that falls outside the generic definition. And that's the path that your adversary has gone down with a series of very thought-provoking documents showing that the State has prosecuted and trial courts in the State have declined to dismiss prosecutions for a very wide array of activity where we're looking at the potential creation of a risk of moral injury, for example, which is very abstract, which has not been – where the State hasn't been put to any proof about moral injury or continuing psychological injury where courts have been content to presume some kind of damage or risk. And that seemed to me there's a plausible argument to be made that they fall outside of the generic definition. What's your response? Are we precluded from examining these documents? Or is it not a plausible argument that the New York law as prosecuted is much broader than the generic offense? Mm-hmm. As a threshold matter, I think the government's position would be many of these documents that Meeky Council submitted in conjunction with this petition for review were not proffered first to the administrative agency. Do you contest their authenticity, though? No, Your Honor, we do not. But with respect to the follow-up question, which would be that are these charging documents sufficient for purposes of demonstrating what – for showing realistic probability, the government would say no. I think Mendoza – sorry. Let me interrupt. They are backed up by State law decisions in which prosecutions have been upheld and individuals found guilty for child endangerment in a fairly broad array of factual settings. There is a broad array. That's correct, Your Honor. But it's also important to note the context in which these state court cases arose. So, for instance, in I believe it's People v. Reyes, that was a situation in which a parent had left a 5-year-old child by themself in the house for, I believe, at least 15 minutes while she ran down to the grocery store to get groceries. But in that case, that arose in the context – that case arose in the context of the defendant seeking to dismiss the complaint as not being sufficiently supported in its facts. And in dismissing – in declining to dismiss that complaint, the state court indicated, well, these – in determining whether a child endangerment, their level of risk, and all of those sort of elements for conviction purposes, there has to be an examination of how competent was this child. Was this child particularly mature to be able to be put in that circumstance? What was the basis for how long the parent was gone? So there were these sort of factual considerations that the courts should have a chance to be presented before a criminal court and proven before conviction could occur. And so that case, for instance, arose in that context. And so to ask the court to have the agency weigh realistic probability based on those factors as opposed to looking at the conviction, under which circumstance we know – we would know, the government would know, that the elements of a particular crime have been satisfied. And for reasonable – and for categorical analysis purposes, it is all about matching the elements of the state crime to what the federal generic definition requires. But still, don't we look at whether there's a realistic probability of prosecution under the state statute and how the state has enforced its law? And some of that's opaque to us, given how many such charges end in pleas. Nonetheless, the amici and Mr. Matthews have cited circumstances where we're looking at a risk that is related to behavior as to which cultural norms may differ from one family to another. And so it seems to go farther. I mean, the consequences of this finding are enormously significant for many people. That's correct, which is why the agency would require that conviction be what is the evidentiary proof that's offered in order to demonstrate realistic probability. With respect to this particular child endangerment statute, New York state courts have spoken pretty extensively as to the outer bounds of what counts as misconduct that can be criminalized under this particular provision. And so perhaps the situation would be different if there were no case law that could be pointed to either by the government or by petitioner in terms of what kind of misconduct is criminalized here, or perhaps if the language of the actual criminal statute itself was broad or on its face a lot for prosecution in a manner that would be beyond the federal generic definition. But here, the New York state courts have provided case law that expressly recognizes here are situations where it falls within the misconduct criminalized by this statute, and here's conduct which does not. And so I think because the categorical analysis requires that we look at the matching of the elements from one statute to the other, that makes it particularly relevant that the state court decisions are what's looked to, as opposed to a charging document. Some of the state court decisions, though, include the prosecution of a man who took care of a runaway child of friends for two days, and the court found that by hiding the girl from her father and the police, the defendant prevented her from being reunited with a legal guardian, which was likely to be injurious to her physical, mental, and moral welfare, giving her a safe place for two days. In Alvarez, there was a prosecution based on, as I understand it, that marijuana, a finding that marijuana likely was used in the presence of children ages 7 and 10 who were in the apartment at the time. That's right, Your Honor. And in Alvarez, the factual, the facts at issue there indicated that when the police officers came into this house, there was a strong odor of marijuana that was pervasive throughout the residence that indicated it had been recently smoked. And so that was a factual assertion. That was a moral harm, a criminal prosecution for endangering a child for behavior that is now legal in several states. Putting aside whatever the ambiguities of the usage of marijuana may be, it remains a criminal conduct in this jurisdiction. And I think given those circumstances, that there were minors in the house and that marijuana had clearly been smoked, and that there were 18 bags of marijuana that were also found throughout Every Live on the Persons, the adults in the house as well as other locations throughout the residence. That these facts were enough to indicate that that was conduct injurious to certainly the moral welfare of the minors in the house. But it's also important to note that on sort of similar factual grounds, the State Court of New York has also found that it has had a case where just having a legal substance in the house, the presence of a legal substance in the house, where there was no other additional fact regarding whether it had been smoked or any of those other sort of relevant factors that were present in Alvarez. That those were not enough, in those circumstances, that that was not enough to sustain a conviction under 260.10. To the INA language, which looks for a crime of child abuse, child neglect, or child abandonment, and I find it hard to square the two. But I guess the BIA has. Correct. And Your Honor, this court has, in Flores, deferred to that as a reasonable interpretation. And as the court noted in Flores, deference to the board's decision doesn't always entail perhaps what the court itself would have defined, or even the best definition. But just that it be reasonable and grounded in reason, which this court found that it was. Thank you, Ms. Park. We could ask just one last question. Do we need to defer to the board's understanding of the state statute? No. No, Your Honor. Thank you. Thank you, Ms. Park. Thank you. Just two brief points. First, just to get to this issue of Esquivel-Quintana, I just want to address it one more time quickly. Esquivel-Quintana may have addressed the issue that the government discussed, but the analysis, the mode of analysis at Chevron Step 1 is entirely irreconcilable with Flores. Both cases involved irreconcilable with Flores. Both cases involved undefined generic federal offenses with varying state laws. Esquivel-Quintana held that is not enough to establish ambiguity. Flores held it is. And that doesn't necessarily mean that at that point this court is simply required to revisit that analysis and apply the tools we've identified. But getting to Chevron Step 2, the first point I want to make is that the government is simply wrong that Flores held that this court held that classifying New York's endangerment provision as a categorically removable offense was reasonable. Flores explicitly did not reach that question. And, in fact, Judge Lohier's concurrence in Flores made that abundantly clear. And I would encourage the court to read that concurrence because the petitioner in that case simply didn't preserve that question. So the question of whether Mendoza-Osorio, the decision that actually classified New York's provision as a removable offense, has never been addressed by this court at Chevron Second Step. And for the reasons that you were getting at, Judge Carney, it's quite clear that that was an unreasonable decision. New York courts have interpreted this provision incredibly broadly, including conduct that, as Your Honor noted, has cultural implications. Also, frankly, the type of conduct that single working parents often have little choice but to leave a sleeping child at home for 15 minutes while running out to get groceries for dinner. And, you know, whether New York chooses to make that a crime under its misdemeanor endangerment provision, a crime that almost never or only rarely results in any imprisonment, that's one thing. But to think that the 1996 Congress, in making noncitizens removable for convictions of abuse, neglect, and abandonment, intended to sweep in that type of conduct and potentially separate for the rest of their lives, potentially, a parent from their child simply because she trusted them to be home for 15 minutes while she got groceries for dinner is simply not a reasonable interpretation of the statute. Thank you very much. Thank you both. We'll reserve decision in this case. Thank you.